Filed: July 6, 2000

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

Nos. 99-7503(L)
(CA-95-3834-L)

_____

James David Proctor,

                              Petitioner - Appellee,

        versus

Joseph P. Sacchet, et al,

                              Respondents - Appellants.

_____

O R D E R

_____

The court amends its opinion filed June 16, 2000, as follows:

On page 6, footnote 3, lines 5-6 -- The citation to <u>Noland v. French</u> is corrected to read:  134 F.3d 208, 213 (4th Cir. 1998).

                              For the Court - By Direction

                              /s/ Patricia S. Connor
                              _____
                                    Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JAMES DAVID PROCTOR,
Petitioner-Appellee,

v.

No. 99-7503

JOSEPH P. SACCHET; ATTORNEY
GENERAL FOR THE STATE OF
MARYLAND,
Respondents-Appellants.

JAMES DAVID PROCTOR,
Petitioner-Appellant,

v.

No. 99-7584

ATTORNEY GENERAL FOR THE STATE OF
MARYLAND; JOSEPH P. SACCHET,
Respondents-Appellees.

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Benson E. Legg, District Judge.
(CA-95-3834-L)

Argued: May 2, 2000

Decided: June 16, 2000

Before WILKINS and LUTTIG, Circuit Judges, and
Frank W. BULLOCK, Jr., United States District Judge
for the Middle District of North Carolina,
sitting by designation.

_____

Reversed in part and affirmed in part by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Ann Norman Bosse, Assistant Attorney General, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL, Baltimore, Maryland, for Appellants. Denise Charlotte Barrett, Assistant Federal Public Defender, Baltimore, Maryland, for Appellee. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL, Baltimore, Maryland, for Appellants. James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

James Proctor was convicted in 1981 by a Maryland jury of murdering his seventeen-year-old brother-in-law and ward, of committing sexual offenses against two fourteen-year-old girls, and of fraudulently misappropriating funds as a fiduciary. He was sentenced to life imprisonment and other prison terms. The district court granted his petition for writ of habeas corpus on two of the three grounds he presented for relief, and the state appeals. Proctor cross-appeals the district court's rejection of his third ground for relief. For the reasons that follow, we deny Proctor's petition on all grounds, reversing in part and affirming in part the judgment of the district court.

I.

The events that preceded the murder of Eugene ("B.G.") Startley Schubert, according to the Maryland Court of Special Appeals, were as follows:

2

Upon the death of their parents, B.G. and his sister, Kim Schubert, had been appointed wards of their sister, Catherine Schubert Proctor[,] and her husband, [Proctor]. The guardianship assets included a $45,000 insurance policy, Social Security Survivor Benefits, and annuity benefits. [Proctor], faced with financial difficulties, depleted the guardianship account without obtaining court approval. He admitted knowing that it was necessary to obtain the court's permission before using the guardianship funds.

On 3 September 1980 [Proctor] had purchased a $100,000 whole life policy with double indemnity for accidental death on the life of B.G. [Proctor] was the named beneficiary.[1] Evidence was also presented at trial to show that[Proctor] was listed as next of kin for B.G. on a $20,000 servicemen's group life insurance policy that B.G. was automatically eligible for as a member of the National Guard.

Kim Schubert, B.G.'s sister and [Proctor's] sister-in-law and ward, testified to several sexual encounters between her and [Proctor]. Kim was fourteen at the time of these incidents. She further testified that she thought [Proctor] was jealous of a romance developing between B.G. and Laura Kirby who was also fourteen year[s] old.

Laura Kirby, a friend of both Kim and B.G., would often spend the night with Kim. Laura testified to similar sexual encounters with [Proctor] during these visits. Their relationship culminated in sexual intercourse occurring several times over a two month period. [Proctor] admitted to hav-[ing] had sexual relationships with both girls.

J.A. 932-33 (opinion of Md. Court of Special Appeals).

Proctor claimed that the last time he saw B.G. alive was on the morning of December 1, 1980, when Proctor alleged that he was training B.G. in gun safety at Proctor's parents' home. Proctor

_____

[1] Proctor later purchased life insurance policies in smaller amounts on the lives of Kim Schubert and his two children.

3

claimed that after the training session ended, and while B.G. was putting the firearms in Proctor's car, he went inside his parents' home. Proctor claimed that he then left the house, believing that B.G.'s friend was going to take him to school.

On December 2, after having been informed by his wife that B.G. had not returned home the night before, Proctor telephoned the Anne Arundel County Police Department to report that B.G. had been missing since the previous morning. He specifically requested that the police search the woods behind his parents' house, but they refused to do so because the property was too large. Proctor left work for several days, purportedly to search for B.G.

On December 8, Proctor called the police to report that he had found B.G.'s body in the woods behind Proctor's parents' house. He claimed that he had spotted a "bright orange object" in the woods while he had been dumping old boxes at a dumpsite on the property. He said that he had approached the object and discovered that it was B.G.'s body and that B.G. was wearing a bright orange hunting vest.

It was subsequently determined that B.G. died from a single gunshot wound in the back. Detective Moore, a homicide detective, found shrapnel underneath B.G.'s shirt and inside the wound. Four months after the body was discovered, the police found a .30 caliber bullet jacket in a tree thirty-four feet from where the police believed B.G. had been standing when he was shot. The FBI discovered human protein on the bullet jacket. The police thereafter arrested Proctor for sex crimes and for the murder of B.G.

Proctor was indicted by a grand jury in Anne Arundel County on eleven counts: the deliberate and premeditated murder of B.G. Schubert, six sex offenses against Kim and Laura, two felony theft offenses, and two counts of fraudulent misappropriation by a fiduciary. On September 9, 1981, a jury found Proctor guilty on all counts, and sentenced him to life imprisonment for the murder conviction and to varying prison terms for the remaining counts.

Proctor appealed his convictions to the Maryland Court of Special Appeals, and that court reversed his theft convictions, and affirmed

4

the other convictions. The Maryland Court of Appeals denied Proctor's request for a writ of certiorari.

Proctor then filed a petition for post-conviction relief in the Circuit Court for Anne Arundel County. The circuit court held a hearing on Proctor's amended petition for post-conviction relief, at which Proctor, his trial counsel, and the prosecutor at Proctor's trial testified. The court denied Proctor's amended petition and the Maryland Court of Special Appeals later denied his application for leave to appeal the circuit court's decision.

Proctor filed a motion for a new trial, which was denied without a hearing.

On December 15, 1995, Proctor filed a petition for writ of habeas corpus in the federal district court, and an evidentiary hearing was thereafter held on October 29, 1998.**2** Accepting the federal magistrate's report and recommendation in part, the district court granted Proctor's petition for writ of habeas corpus in part, and denied it in part. These appeals by the State of Maryland and Proctor followed.

II.

The state argues that the district court erred when it held that Proctor's absence during a communication from a juror to the trial court substantially affected or influenced the jury's verdict. The state also argues that the district court erred when it held that Proctor's trial counsel was constitutionally ineffective. Proctor, in his cross-appeal, argues that the district court erred when it rejected his claim that the

_____

**2** The state argues that the federal magistrate erred by holding an evidentiary hearing. See Appellants' Br. at 31-33. In Townsend v. Sain, 372 U.S. 293, 318 (1963), overruled on other grounds by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992), the Supreme Court held that a federal judge has the discretion to hold an evidentiary hearing "where an applicant . . . alleges facts which, if proved, would entitle him to relief." 372 U.S. at 312. We conclude that the federal magistrate judge did not err in holding an evidentiary hearing.

prosecution knowingly presented a false theory of the case to the jury. We address each argument below.**3**

A.

The State first contends that the district court erred in holding that Proctor's absence during a communication from a juror to the trial judge substantially affected or influenced the jury's verdict.

The facts relevant to the state's claim of error (and Proctor's underlying claim) are as follows. Proctor testified at trial that when he was dumping old boxes at the dumpsite on his parents' property, he saw something orange in the distance. He stated that, upon closer inspection, he realized that what he saw was B.G.'s body and that B.G. was wearing an orange hunting vest. Proctor testified that the body was approximately 100 to 150 yards from the dumpsite. J.A. 572-76. Police Detective Moore, on the other hand, estimated that the body was found approximately 300 to 500 yards from the dumpsite. J.A. 327.

During the trial, before the defense rested, a juror sent the following note to the trial judge:

> Can the distance from the dump to the site where the body was found be accurately determined through some other means than estimates?

The trial judge neither responded to the note nor informed counsel that the note had been received. Proctor's counsel did not discover that the note had been written until after the trial ended.

_____

**3** Because Proctor filed his petition in 1995, the Antiterrorism and Effective Death Penalty Act ("AEDPA") amendments do not apply to Proctor's case. Instead, under the pre-AEDPA standard of review, we review de novo questions of law and mixed questions of law and fact decided by the state courts. Noland v. French, 134 F.3d 208, 213 (4th Cir. 1998). However, any state court factual findings are presumed to be correct, as long as they were made after a hearing on the merits. See 28 U.S.C. § 2254(d) (pre-AEDPA).

6

The district court held that Proctor's absence during this critical stage[4] of his trial had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

Assuming, without deciding, that the juror's communication constituted a critical stage of trial at which Proctor had a constitutional right to be present, we agree with the state that Proctor's absence from this stage of the proceeding did not have a substantial or injurious effect on the jury's verdict. Proctor advances only one argument as to how he was prejudiced by his absence from the communication between the juror and the trial judge. He contends that had he and his counsel been informed of the juror's question, his counsel would have measured the actual distance from the dumpsite to the location where B.G.'s body was found and presented that evidence during trial. Because the actual distance was less than that estimated by Proctor and considerably less than that estimated by Detective Moore -- some 45 yards instead of Proctor's estimated 100 to 150 yards and Moore's estimated 300 to 500 yards[5] -- Proctor argues that the jury would have found credible his story that he first saw the orange vest while he was dumping boxes, and therefore would have believed that he did not murder B.G.

_____

[4] Proctor raised the issue of his absence from the communication in his state motion for new trial, and the trial judge denied the motion. Proctor raised the same issue in the Court of Special Appeals of Maryland, which held that the juror communication was not a critical stage of the trial, and that therefore Proctor had no right to be present. The district court held, however, that the communication was a critical stage for constitutional purposes, accepting the magistrate's recommendation that "[i]t is clear that [the] jury communication[ ] occurred during a critical stage of the trial," J.A. 1720, because it had "a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge," United States v. Gagnon, 470 U.S. 522, 526 (1985). J.A. 1776.

[5] On November 13, 1997, some sixteen years after B.G.'s body was found, Proctor's federal habeas counsel sent an investigator from the Office of the Public Defender, Neil Duke, to measure the actual distance from the dumpsite to the place where the body was located. At the hearing, Duke testified that the actual distance between the locations was 137 feet.

It is apparent, however, that the actual distance between the dump-site and the location of B.G.'s body was of little, if any, relevance to the jury's verdict, given that Proctor's testimony that he could see B.G.'s body from the dumpsite was confirmed by the state's own witness, Police Officer Bearden, who arrived on the scene in response to Proctor's call on December 8. Officer Bearden testified that, at that time, he, too, could see something orange from the dumpsite. He testified that, from the dumpsite, "you could just barely make out a slight orange glimpse in the woods . . . if you looked real hard." J.A. 245. Because no witness testified to the contrary, there is every reason to believe that the jury concluded, irrespective of the actual distance between the dumpsite and B.G.'s body, that B.G.'s body was visible from the dumpsite, and that the jury rejected Proctor's defense for reasons unrelated to whether the body was or was not visible from that location.

For example, Proctor's cellmate, Wooden, testified that Proctor confessed to the murder.[6] The bullet found near B.G.'s body came from one of two types of guns, one of which was of a type that Proctor had purchased but could not produce. Proctor had depleted B.G.'s trust without authorization, and then taken out a large life insurance policy on the seventeen-year-old B.G., who would be able, when he turned eighteen, to demand an accounting of the trust funds from Proctor. Proctor conceded that he committed multiple sexual offenses against B.G.'s fourteen-year-old sister, and there was testimony that Proctor was jealous of a budding romance between B.G. and Laura Kirby, the other fourteen-year-old girl against whom Proctor committed sexual offenses. Finally, there was substantial reason to disbelieve Proctor's explanation that he first learned of the location of B.G.'s body as he was dumping boxes at the dumpsite on December 8, including that he had waited a week to search the very property on which he had last seen B.G. and then had not begun his search (alone and with a flashlight) until almost dark.

_____

[6] Wooden also said that while he and Proctor were watching a television show in which a woman shot a girl, Proctor said "that's what the girl deserved" and "`[t]hat's why I killed . ..' and stopped right there." J.A. 488. Proctor also told Wooden he expected to get $30,000 or $40,000 because a relative had died. J.A. 489.

8

B.

The state also argues that the district court erred in holding that Proctor's trial counsel rendered constitutionally inadequate assistance in violation of Proctor's rights under the Sixth Amendment. In so holding, the district court accepted Proctor's contentions that trial counsel was objectively unreasonable in failing to refute the prosecution theory that B.G. was killed by a mercury-tipped bullet and in failing to refute the prosecution's bullet path analysis. We agree with the Maryland Court of Appeals that, in both respects, Proctor's trial counsel's performance was well within the range of reasonableness, and in any event not prejudicial, when adjudged by the objective standard of Strickland v. Washington, 466 U.S. 668, 687-88 (1984).

1.

In closing argument, the prosecution contended that B.G. was killed by a bullet tipped with mercury. For this contention, the prosecution relied on the trial testimony of three witnesses. First, Proctor's cellmate, Wooden, testified that Proctor told him that he murdered using a mercury-tipped bullet:

> Uhh . . . once he was sitting on the bed and said uhh . . . he was telling me about the . . . how he used to put mercury into the tips of bullets so when they hit they would explode and disintegrate and that's how they wouldn't uhh . . . convict him of murder because they didn't have the bullet. And they'd probably just say it was a hunting accident.

J.A. 486. Wooden also said that Proctor told him

> that when you put two drops, well, if you take like a hollow nosed point bullet and put two drops of uhh . . . mercury in it and put [it] over the tip, that when you fire it, when it hits the bullet will disintegrate on impact.

J.A. 489.

Second, Detective Moore testified that he saw what looked like shrapnel around the wound on B.G.'s body, and that it was unusual

9

to find such "shrapnel." J.A. 302. Third, Proctor, a firearms dealer and self-professed expert in loading and preparing ammunition, testified that he was familiar with a bullet with mercury because he had read about this technique in a gun magazine. J.A. 691-92.

The district court, after an evidentiary hearing, found that the mercury-tipped bullet theory advanced by the prosecution was erroneous. The district court reached this conclusion based upon the testimony of two doctors who testified at the federal habeas hearing. Dr. Fowler, a Maryland medical examiner, testified that the presence of shrapnel would be inconsistent with the use of a mercury-tipped bullet because one would not expect to find debris outside the wound, but, rather, mushrooming inside. Dr. Dixon, who performed the autopsy on B.G. before trial, testified that she did not find any evidence of trace mercury in the wounds. Based upon the testimony of these two doctors, the district court concluded that trial counsel was ineffective because he did not present "readily available" evidence to refute the mercury-tipped bullet theory.

Viewing counsel's performance at the time of trial, 1981, we are satisfied that counsel's performance was not objectively unreasonable. Viewing the trial both as a whole and as it unfolded before Proctor's trial counsel, we are confident that Proctor's counsel did not act unreasonably by choosing not to attempt to refute the prosecution's "mercury-tipped bullet theory." The prosecution did not present the "theory" of the mercury-tipped bullet in opening argument. The prosecution did not refer to a mercury-tipped bullet when it asked Detective Moore about the wound; Detective Moore merely described finding shrapnel around the wound and testified, without more, that that was unusual. J.A. 302-03. In fact, that the prosecution intended to argue that B.G. was murdered with a mercury-tipped bullet was not apparent until the prosecution's closing argument-- a fact, significantly, that Proctor's federal habeas counsel did not contest in oral argument before this court.

Proctor's habeas counsel now argues that trial counsel should have anticipated that the prosecution would ultimately rely upon a mercury-tipped bullet theory. But to accept this argument, we would have to ignore entirely the way in which the case was prosecuted by the state and require of Proctor's counsel that he have anticipated the

10

prosecution's reliance in closing argument upon a theory for which there was little forewarning. During the trial, the prosecution offered no expert testimony in support of its theory that a mercury-tipped bullet was used in the murder; it did not call an expert to testify on terminal ballistics or the alteration of ammunition. Nor did it introduce forensic evidence of the presence of mercury. Indeed, there was little testimony that even touched upon mercury-tipping beyond the testimony of Proctor's cellmate, Wooden. The autopsy report was entered into the record, and there was no suggestion in that report of the presence of mercury. Nor was there proof of mercury found in the wounds or on the bullet jacket that was found. And the only individual at trial to claim any expertise in the loading of bullets was Proctor himself, and he testified in response to the question whether he had altered bullets with mercury: "No, sir I have not. Would that be done, there would have to be traces of mercury." J.A. 692.

Proctor's counsel vigorously attempted to impeach the only witness, Wooden, whose testimony might have suggested the use of a mercury-tipped bullet. Counsel cross-examined Wooden extensively, questioning him inter alia about the benefits he would receive from the government in exchange for his testimony. J.A. 490-500. And counsel presented numerous witnesses to show that the conversations Wooden purportedly had with Proctor could not have occurred on the dates to which Wooden testified, because Proctor and Wooden were not together on those dates. J.A. 710-14, 717-21, 744-48, 750-51. In addition counsel questioned Wooden and presented witnesses that testified about the disagreements between Wooden and Proctor, J.A. 490-500, 752-55, including threats Wooden made that he would get even with Proctor, J.A. 747-48 (witness testifying that Wooden said of Proctor, "I'm going to get that boy, Proctor. . . . I know how to get him back, he had a murder charge."). Given the complete absence of any suggestion other than from Wooden during the entire course of the trial that a mercury-tipped bullet theory would be advanced in closing argument, we are satisfied that counsel's decision not to attempt refutation of a mercury-tipped bullet theory fell well within the range of objective reasonableness.

There is nothing in the record before us to suggest that, even had trial counsel chosen to pursue forensic testimony to refute the prosecution's mercury-tipped bullet theory, counsel could have found doc-

11

tors who would testify on the theory in any event. Some seventeen years after Proctor's conviction, the district court was presented with the testimony of two such doctors. However, Dr. Fowler was still in medical school at the time of Proctor's conviction and certainly would not have been available to testify as an expert witness. And Dr. Dixon, who examined B.G.'s body for trial, acknowledged that she was unaware of the mercury-tipped bullet theory at the time of the trial. J.A. 1720-21. Until Dr. Fowler provided her background on the mercury-tipped bullet, she did not even know about this type of bullet at the time of Proctor's federal evidentiary hearing in 1998.

And even if we were to conclude that trial counsel's performance was objectively unreasonable, we would reject Proctor's argument that he was actually prejudiced by counsel's performance. Proctor argues that without the mercury-tipped bullet theory, the prosecution would have had insufficient evidence upon which to find premeditation. However, the jury readily could have found premeditation based upon Proctor's purchase of the $100,000 life insurance policy, with a double indemnity for accidental death, only three months before B.G.'s murder.

2.

The district court also suggested that trial counsel was ineffective when he did not present evidence to refute Police Detective Mock's testimony on behalf of the prosecution that, if B.G. had been shot by a stray bullet from the crest of the hill overlooking the location where the body was found, the bullet would have struck the ground and not the tree in which the bullet jacket was found.[7] In so suggesting, the

_____

[7] It is not clear whether the district court actually held that trial counsel was constitutionally ineffective for failing to refute the prosecution's bullet path analysis, and, if so, whether it believed that trial counsel's failure in this regard actually prejudiced Proctor. However, in the district court's footnote discussion of this claim, the court did suggest that counsel should have presented an expert to refute the prosecution's bullet trajectory theory. J.A. 1800 n.24. The district court based its suggestion upon the affidavit testimony of a ballistic expert, Welch, that, because the bullet entered B.G.'s body at a thirteen-degree downward angle, the bullet could have been fired from the crest of the hill and hit B.G. standing on the ledge below. According to the district court, with this information, the jury could have more readily credited the defense theory that B.G. was actually shot by a stray bullet.

12

district court apparently accepted Proctor's argument that trial counsel should have conceded that the bullet jacket found in the tree by Detective Mock was from the bullet that killed B.G., and introduced trajectory evidence to establish that that bullet could have originated from the crest of the hill -- evidence that would have supported the defense theory that a random shot by a hunter killed B.G. Proctor's counsel instead pursued a strategy of proving that the bullet jacket found in the tree, which was from a gun of a type purchased and assertedly lost by Proctor, was not from the bullet that killed B.G. and that the bullet that killed B.G. was never recovered.

We cannot conclude that counsel's strategy of arguing that the bullet jacket found in the tree was not that from the bullet that killed B.G. and that a hunter's stray bullet, which was never found by police, actually killed the boy, was objectively unreasonable, or even unreasonable at all. And of course, Detective Mock's testimony that a bullet fired from over the crest of the hill would have lodged in the ground, not in the tree, was consistent with and, in fact, supportive of, this defense. Among other advantages, this strategy enabled counsel to argue to the jury that the prosecution was unable to prove that the bullet jacket found in the tree was from the bullet that killed B.G., and therefore unable to prove that the bullet that killed B.G. was from the type of gun purchased by Proctor, and at the same time to rely upon testimony from the government's own witness that the bullet that killed B.G. may well have been a stray from the gun of a hunter. Given counsel's strategy of arguing that Mock's testimony was actually consistent with, and supportive of, the defense theory, no argument can be made that he was required to offer expert testimony to refute that testimony. Even if this strategy chosen by counsel were not imminently reasonable, which we believe it was, counsel elicited from Mock on cross-examination his lack of expertise in ballistics on the contingency that the jury might ultimately be unpersuaded by the defense theory that B.G. was killed by a stray bullet. J.A. 379-85. In combination, these strategies were more than reasonable under the circumstances.

C.

Finally, Proctor argues that the district court erred in rejecting his claim that the prosecution violated his constitutional due process

13

rights by knowingly presenting a false theory of Proctor's case when it advanced the mercury-tipped bullet theory in its closing argument. We disagree.**8**

To show that his due process rights were violated by the prosecution's presentation of the mercury-tipped bullet theory, Proctor must show that the prosecution knew that the theory or evidence was false at the time of the trial. See Napue v. Illinois, 360 U.S. 264, 269 (1959) ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." (emphasis added)).

Even assuming that that theory is now known to be false, we agree with the district court that Proctor has not established that the prosecution knew the theory to be false in 1981, when it offered the theory. As noted above, the theory that B.G. was shot by a mercury-tipped bullet was supported by the trial testimony of Proctor's cellmate, Wooden, as well as by Proctor himself, and, although not explicitly so, the testimony of other witnesses at least provided a foundation for argument of such a theory.**9** Given this testimony, and given Proctor's failure to produce evidence suggesting otherwise, we have no reason to believe that the prosecution knew the mercury-tipped bullet theory to be false when it presented that theory to the jury.

We therefore conclude that the district court correctly rejected Proctor's claim that the prosecution knew the mercury-tipped bullet theory to be false when it presented that theory to the jury.

_____

**8** Both the Maryland post-conviction court and the federal district court rejected this claim. The Maryland court found that the prosecution did not adopt a mercury-tipped bullet theory, J.A. 1129, and the district court found that the mercury-tipped bullet theory was false, but held that the prosecutor was "at most negligent in his investigation of the case," J.A. 1793, but did not "knowingly" present a false theory of the case.

**9** Proctor asserts that the prosecution knew the mercury-tipped bullet theory to be false when it discovered that there was no trace of mercury in B.G.'s wound. However, Drs. Fowler and Dixon both testified at the habeas evidentiary hearing that a mercury-tipped bullet could have caused the wound without leaving behind any trace of mercury.

14

III.

For the foregoing reasons, that portion of the district court's judgment granting the petition for habeas relief with regard to Proctor's juror communication and ineffective assistance of counsel claims is reversed, and that portion of the district court's judgment denying Proctor's petition with regard to the claim that the prosecution knowingly presented a false theory of the case is affirmed.

REVERSED IN PART; AFFIRMED IN PART

15